# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CLIFFORD FRANK BROWN and<br>VERONICA MOSLEY,<br><br>Defendants. | Case No. CR05-0087<br><br>REPORT AND RECOMMENDATION |

This matter comes before the court pursuant to motions to suppress evidence filed in this matter by Defendant Veronica Mosley on November 4, 2005 (docket number 42) and by Defendant Clifford Frank Brown on November 17, 2005 (docket number 53). The motions were referred to the undersigned United States Magistrate Judge for issuance of a report and recommendation. The court held an evidentiary hearing on these motions on November 28, 2005, at which Defendant Brown was present and represented by Casey Jones. Defendant Mosley was present and represented by Michael Lahammer. The government was represented by Assistant United States Attorney Robert Teig. It is recommended that the motions to suppress be denied.

The defendants allege that the Fourth Amendment was violated when an automobile driven by Defendant Mosley and in which Defendant Brown was a passenger was stopped on Interstate Highway 20 in Fort Dodge, Iowa, on October 6, 2005. The defendants seek to suppress physical evidence seized from the automobile as well as statements subsequently made by them. The government contends that the stops were supported by reasonable suspicion. The court makes the following findings of fact and conclusions of law.

1

## FINDINGS OF FACT

On October 6, 2005, the Ackley State Bank in Ackley, Iowa, was robbed when three African American men entered the bank and took money at gunpoint. The bank was robbed at approximately 9:00 in the morning. Shortly after the robbery, police dispatch relayed available information describing the robbers. The call went out to look for four African American men in a white or silver late-model Pontiac Grand Am. The car with the men in it was seen leaving Ackley, Iowa, headed southbound on State Highway 65. Captain Ronald Kuhfus of the Iowa Falls Police Department headed south on Highway 65 in an attempt to locate the Grand Am. Deputy Sheriff Rod Stoner received the call when he was sufficiently south of Iowa Falls that he traveled north on Highway 65 looking for the Grand Am. Another law enforcement officer, Officer Trapp, went east on Highway 20. Highway 20 runs east and west approximately five miles south of Iowa Falls.

When Captain Kuhfus and Deputy Stoner met each other on Highway 65 without seeing the Grand Am, Stoner went west on Highway 20. As he entered the westbound ramp from Highway 65 to Highway 20, he observed an item of clothing that had been discarded. Captain Kuhfus also observed the item of clothing and a black garbage bag. Kuhfus determined that the item of clothing was a pair of blue sweat pants with a white stripe. In the black trash bag Kuhfus found clothes and a handgun. From this information, law enforcement officers reasonably concluded that the bank robbers were headed west on Highway 20. This information was immediately conveyed to other law enforcement officers.

Upon hearing radio traffic about the robbery and the belief that the suspects were heading west on Highway 20, Webster City Police Officer Theodore Knutson drove to Highway 20 at Webster City to look for the suspects. As he watched traffic headed west on Highway 20, he observed a maroon Grand Am automobile occupied by two African American men. He observed them traveling at a very high rate of speed with no license plates on the front or back of the vehicle. Officer Knutson put this information out over

2

the radio and determined that a Sgt. Mork was positioned to his west. Mork observed the maroon Grand Am with three men inside. He pursued the car and requested help. The maroon Grand Am was stopped near Webster City and the stop was captured on police video (Defendant's Exhibit A). Initially, two men voluntarily got out of the car. The third man was crouched behind the front seat of the vehicle. He also was removed from the car, placed on the ground, and immediately handcuffed.

None of the three men from the maroon Grand Am had any form of identification. The front seat passenger told Officer Knutson that his identification was in the automobile. Accordingly, Officer Knutson went to the car to find the identification. Meanwhile, because of the nature of the crime under investigation, the police had stopped the traffic behind them on Highway 20. Knutson observed a white Pontiac Grand Am pull somewhat out of the line of vehicles that had formed as if it were either trying to see what was going on or to perhaps pass the other vehicles on the shoulder. Shortly thereafter, the white Pontiac Grand Am pulled back into the line from which it had started.

Officer Knutson went to the maroon Grand Am to retrieve the passenger's identification. He observed pill bottles in the front console of the car. He picked them up briefly, long enough to observe that they were prescription pill bottles for a female patient. There was also a letter from Iowa Central Community College addressed to a woman. He then found a bag containing the proceeds of the bank robbery.

Once the traffic on Highway 20 was permitted to proceed, Knutson observed the white Pontiac Grand Am go by. As it went by, he made eye contact with both of the passengers who quickly "snapped" their heads forward.

Sergeant Rodney Hickok of the Iowa State Patrol arrived at approximately 9:30 a.m. at the location where the maroon Grand Am had been stopped and the defendants were in custody. He suggested a more thorough pat-down of the suspects who were seated in the back of a patrol car. He commenced this pat-down search at approximately 9:32 a.m. As he did, he asked one of the three men where the fourth man

from their group went. One of the men indicated, "He's in the white car that went that way" indicating the westbound traffic. Sergeant Hickok radioed the information concerning the fourth individual at approximately 9:33 a.m.

Lieutenant Dallas Scott of the Iowa State Patrol was at the Patrol's District 7 office on the southeast side of Fort Dodge when he heard traffic concerning the stop of the maroon Grand Am, the three African American men in custody, and the white Grand Am still headed west. He traveled east on Highway 20 from Fort Dodge until he observed the white Grand Am at approximately 9:38 a.m. He crossed the median of the highway and followed the white Grand Am. He got close enough to observe an African American female driver and an African American male passenger. He continued to follow the car and requested assistance. The car was ultimately stopped at the intersections of Highways 169 and 20 in Fort Dodge. The defendants now before the court were taken into custody and the car was searched.

The white Pontiac Grand Am was later determined to be registered to Jessica Marie Anderson, an acquaintance of Defendant Brown. At the request of the police, Ms. Anderson executed a consent form for the search of her vehicle at 8:45 p.m. on October 6, 2005.

## CONCLUSIONS OF LAW

The defendants assert that Lt. Scott did not have reasonable suspicion to conduct an investigatory stop of the white Pontiac Grand Am that Defendant Mosley was driving. Specifically, the defendants contend that the totality of facts arguably giving rise to reasonable suspicion concerning the occupants of the white Pontiac Grand Am were unknown to Lt. Scott when he stopped the car. The defendants argue that because some of the facts amounting to reasonable suspicion may not have been known to Lt. Scott when

4

he stopped the vehicle, any evidence obtained as a result of the stop should be suppressed as "fruit of the poisonous tree."[1]

The Fourth Amendment protects citizens from unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1 (1968). However, it is well established that "a limited investigative stop of a vehicle by law enforcement officials, without a warrant, 'is permissible under the fourth amendment in limited circumstances.'" United States v. Thomas, 992 F.2d 201, 202 (8th Cir. 1993) (citing United States v. Peoples, 925 F.2d 1082, 1086 (8th Cir. 1991)). Pursuant to Terry v. Ohio, officers may briefly detain and ask questions of people whom they reasonably suspect of criminal activity. Terry, 392 U.S. at 20-23. "This rationale extends to stops of automobiles, when the police have a reasonable suspicion that the occupants are violating the law."[2] United States v. Chhunn, 11 F.3d 107, 109-10 (8th Cir. 1993) (citing United States v. Hensley, 469 U.S. 221, 226 (1985)). "Police officers are justified in stopping a vehicle for investigatory reasons if they have a 'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" Thomas, 992 F.2d 201, 203 (citing United States v. Wantland, 754 F.2d 268, 270 (8th Cir. 1995) (quoting United States v. Place, 462 U.S. 696 (1983)).

Reasonable suspicion is a less demanding standard than the standard for probable cause. Chhunn, 11 F.3d at 110. Reasonable suspicion requires only "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" Id. (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983). In determining whether reasonable suspicion supported a given stop, the court considers all of the circumstances, as well as the

---

[1] Wong Sun v. United States, 371 U.S. 471 (1963).

[2] See United States v. Thomas, 992 F.2d at 203-04 (officers stopped individual because the individual "appeared to match the robbery suspect's description." District Court's finding that officers were justified, based on reasonable suspicion, in stopping the individual was not clearly erroneous).

5

collective knowledge of the officers involved in the traffic stop. Id. (citing united States v. Cortez, 449 U.S. 411 (1981). In considering whether reasonable suspicion exists, the court must consider "the totality of the circumstances," and the "whole picture must be taken into account." Thomas, 992 F.2d at 203 (citing Wantland, 754 F.2d at 270) (quoting Cortez, 449 U.S. at 417). A law enforcement radio dispatcher may alert officers by radio of reports concerning facts becoming known to other officers, and other officers may then rely upon those reports assuming that they have a sufficient indicia of reliability. See United States v. Cutchin, 956 F.2d 1216, 1217-18 (D.C. Cir. 1992). Officers may consider facts based on their own observations, police reports [including radio transmissions], and patterns of particular types of lawbreakers. Id. (citing Cortez, 449 U.S. at 418). In determining whether or not to stop someone, officers may also rely upon "facts which, under other circumstances, might give an appearance of innocence." Id. Investigatory stops of vehicles must be supported by a particularized and objective basis for suspecting criminal conduct. United States v. Cortez, 449 U.S. 411, 417 (1981).

In United States v. O'Connell, 841 F.2d 1408 (8th Cir. 1988), the defendant argued, much like the defendants in this case, that the officer who stopped him "personally did not have sufficient knowledge to constitute probable cause." O'Connell, 841 F.2d at 1419. The court rejected the defendant's argument, citing to United States v. Wright, 641 F.2d 602, 606 (8th Cir. 1981). The O'Connell court recalled that in Wright, the court found probable cause for the seizure of certain items not specified in a search warrant, even though there was "no evidence that the seizing officer personally had probable cause or that he acted at the order or direction of an officer with probable cause." O'Connell, 841 F.2d at 1419 (citing Wright, 641 F.2d at 606). The O'Connell court further recalled that the court's decision in Wright was "based on the theory that consideration of the collective knowledge of the search team was appropriate because the officers had worked closely together during the investigation for the warrant," and that under such circumstances, the court may "presume that the officers have shared relevant knowledge

6

which informs the decision to seize evidence or to detain a particular person, even if the acting officer is unable to completely and correctly articulate the grounds for his suspicion at the time of the search." Id. (citing Wright, 641 F.2d at 606; White v. United States, 448 F.2d 250, 254 (8th Cir. 1971)). The O'Connell court went on to "recognize that the . . . complexity of an investigation may preclude a detaining officer from acquiring or consistently maintaining probable cause or reasonable suspicion of every party under investigation." O'Connell, 841 F.2d at 1419 (citing United States v. Stratton, 453 F.2d 36, 37 (8th Cir. 1972).

      The court finds that based on the totality of the circumstances and the collective knowledge of the officers involved in the search for the robbery suspects in this case, reasonable suspicion existed to believe that the occupants of the white Pontiac Grand Am had been involved in criminal activity. In fact, the court finds that based on the collective knowledge of the officers, probable cause supported the stop of the white Grand Am. First, the timing of the sighting of the white Grand Am sufficiently coincided with the bank robbery: the bank was reportedly robbed at approximately 9:00 a.m., and the white Grand Am was spotted at a distance of approximately 20 to 30 miles from the bank approximately ½ hour after the robbery occurred.[3] Second, officers had discovered clothing and a firearm in a trashbag on the on-ramp to Highway 20 westbound, indicating that the robbery suspects were traveling westbound on Highway 20 rather than north or south on Highway 65. Third, the officers understood, based on the initial reports, that there were four suspects involved in the robbery. Upon the stop of the maroon Grand Am, the discovery of the proceeds from the robbery, and the subsequent arrest of three suspects who had been riding in that car, the officers knew that at least one suspect was still missing, and further knew that initial reports concerned a white Grand Am. Fourth, in searching the maroon vehicle, officers discovered indicia of a female being involved with the maroon vehicle,

---

[3] Evidence at the suppression hearing indicated that Defendant Mosley and Defendant Brown were stopped in the white Grand Am at approximately 9:38 a.m.

7

and accordingly presumed that the female may be in some way involved with the robbery suspects. Fifth, Officer Knutson noticed a white Pontiac Grand Am in the line of cars waiting to pass the scene because it nosed onto the right shoulder, as if to be inquiring as to what had stopped traffic or to get around whatever had stopped traffic, and then pulled back into traffic, raising Officer Knutson's suspicions and prompting him to indicate to other officers at the scene that he suspected more of the robbery suspects might be in that vehicle and that it should be stopped. Sixth, Officer Knutson noticed that when he made eye contact with the occupants of the white Grand Am as they passed by the scene, the occupants "snapped" their heads back forward, as if to avoid further eye contact with the officer. Seventh, the officers relied on their training and experience which indicated that it is common for suspects to split up, to change cars, and that more individuals may be involved in a crime than originally indicated, such as get-away-drivers. Finally, one of the three suspects reported to Officer Hicok, when asked where the fourth suspect could be found, that the fourth suspect was in a "white car going that way," indicating westbound on Highway 20.

The court finds that these facts amount to reasonable suspicion to believe that the occupants of the white Pontiac Grand Am had been involved in criminal activity. This case, even more so than O'Connell, mitigates in favor of a finding that regardless of Officer Scott's personal knowledge as to all of the relevant facts amounting to reasonable suspicion, reasonable suspicion existed to stop the white Pontiac Grand Am. In this case, the evidence indicates that Lt. Scott did act at the direction of officers who had reasonable suspicion when he stopped the white Pontiac Grand Am in response to the radio call directing officers to stop the vehicle if spotted. See O'Connell, 841 F.2d at 1419 (citing Wright, 641 F.2d at 606). The court rejects the defendants' argument that an officer who is directed to stop a vehicle that is being pursued following the commission of a crime must himself have all of the relevant facts and circumstances arising to reasonable suspicion or probable cause personally known to him before he can legally stop the vehicle. Rather,

it is the collective knowledge of the officers that the court is concerned with, and the court finds that the collective knowledge in this case easily meets the standard of reasonable suspicion necessary to have stopped the white Pontiac Grand Am.

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation within ten (10) days of the date of the report and recommendation, that the defendants' motions to suppress be denied.

November 30, 2005.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[4] Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.

9